United States District Court
Southern District of Texas
ENTERED

DEC 1 5 2014

David J. Bradley, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| United States of America, | § | |
|     *Plaintiff*, | § | |
| | § | |
| vs. | § | Criminal Action No. 1:14-CR-654 |
| | § | |
| Miguel David Beckes, | § | |
|     *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

I. Introduction

This matter is before the Court on a Motion to Suppress [Doc. No. 23] brought by Defendant, Miguel Beckes. Beckes is charged by way of a criminal complaint [Doc. No. 1] with one count of possessing child pornography in violation of 18 U.S.C. § 2252A. Beckes moves to suppress all evidence seized during a warrantless search of his electronic devices, as well as all statements and evidenced derived therefrom. The United States of America (the "Government") opposes the motion. [Doc. No. 25]. An evidentiary hearing was held on November 4, 2014. For the reasons stated herein, Beckes' Motion to Suppress [Doc. No. 23] is **GRANTED**.

II. Facts

In 2013, the Homeland Security Investigations agency ("HSI") began conducting an undercover internet operation in Brownsville, Texas. The purpose of the operation was to track the online dissemination of child pornography and identify the individuals involved in its transmission. Working on this operation, HSI Agent Guy Baker identified an IP address in Brownsville that had downloaded child pornography from an online peer-to-peer file sharing

1

network. While monitoring this IP address for a two-month period in the summer of 2013, Agent Baker identified a substantial amount of child pornography that had been downloaded from the internet. Although Agent Baker subsequently applied for and received a search warrant, the IP address was changed in January of 2014. After this change, Agent Baker determined that HSI no longer had enough evidence to execute the warrant. In addition to the changed IP address, visual surveillance of the residence associated with the IP address had not produced any significant evidence. During this period of surveillance, Agent Baker had not seen anyone arriving at or leaving the residence, and was concerned that "nobody was at the house."

In January of 2014, Agent Baker identified a second IP address associated with the same residence that was also downloading child pornography. Between July and August of 2014, surveillance during business hours revealed no activity at the house. Without obtaining a search warrant, Agent Baker and another HSI agent went to the residence on the morning of August 5, 2014 intending to talk to its occupants regarding the child pornography downloaded to the residence's IP addresses. (No explanation was offered for their failure to obtain a warrant.) Hector Blanco answered the door at the residence and the agents identified themselves by showing Blanco their badges. Blanco's and Agent Baker's accounts of this initial interaction differ significantly: At the suppression hearing, Blanco testified that Agent Baker explained to him that they had come to the residence "because they had reports that some suspicious activity was coming out from the house." Blanco stated that he asked the agents to describe the type of "suspicious activity" they were investigating, but did not receive any clarification on that point. Conversely, Agent Baker testified that, immediately after displaying his credentials to Blanco, he explained that the agents were "looking for . . . illegal images and videos of persons under the age of 18" that had been downloaded to the residence's IP address. He also recalled that Blanco

2

asked the agents several questions regarding their investigation; however, Agent Baker testified that he did clarify the purpose of the agents' visit, and specifically told Blanco that "kids were being downloaded from his . . . IP address."

Both Blanco and Agent Baker testified that Blanco admitted the agents into his residence; however, their recollections as to the events that followed afterward differ markedly. Blanco stated that after he admitted the agents into the residence, they instructed him to "bring [his computer] to them." After giving the agents his computer, Blanco recalled that they told him that "they wanted to check for certain extension files to see if the neighbors had gotten into the WiFi network." The agents proceeded to examine the computer for thirty to forty-five minutes, afterwards telling Blanco that "they didn't find anything." The agents also searched Blanco's tablet, which similarly yielded no incriminating information.

Blanco stated that after they inspected his computer and tablet, the agents inquired as to whether anyone else lived at the residence. Agent Baker, however, testified that immediately after the agents entered the residence and before conducting any searches they asked whether any other individuals were present in the home. After Blanco indicated that Miguel Beckes was upstairs, Agent Baker requested that Blanco ask Beckes to come downstairs. Blanco complied and Beckes joined them downstairs. With both men downstairs, Agent Baker testified that he reiterated the purpose of the agents' visit: to look for "illegal images and videos of persons under the age of 18." Agent Baker stated that he repeated this purpose several times to Blanco and Beckes, using the word "kids" once and the word "children" once. According to Agent Baker, he then asked to examine the men's electronics and, after receiving permission, the agents conducted the searches. During his search of Beckes' laptop computer, Agent Baker found three

or four images of child pornography. Agent Baker then asked Beckes "if there was somewhere private" that they could talk, and accompanied Beckes upstairs.

Beckes' account of the interaction with the agents is similar to Blanco's. It also suggests that Beckes was not summoned downstairs until the agents had completed their search of Blanco's electronics. Beckes testified that, once he arrived downstairs, Agent Baker explained to him that the agents were investigating "suspicious activity in the neighborhood [and] that they wanted to check on the computer." Beckes did not recall Agent Baker saying anything regarding "child pornography." Similarly, Blanco did not recall hearing Agent Baker tell Beckes anything about "child pornography." Beckes stated that Agent Baker told him to retrieve his electronic devices and, without asking for permission, began to search them. After finishing the searches, Agent Baker told Beckes that he wanted to talk to him upstairs.

Though congruent on some points, Beckes' and Agent Baker's testimonies regarding their interactions upstairs also differ significantly. Beckes testified that once upstairs, Agent Baker reiterated that the agents were looking for "suspicious activity," but also mentioned for the first time that they were looking for "child pornography." Pursuant to Agent Baker's request, Beckes turned over his external hard drives, stating that he believed he "wouldn't get arrested or anything" if he cooperated. Conversely, Agent Baker testified that Beckes' upstair statements were more of an admission. Specifically, Agent Baker stated that Beckes told him that "he knew what [Agent Baker] was looking for" and that he "had other devices that would have the same type of material on it." Agent Baker recalled telling Beckes he would like to see those devices, and Beckes retrieved the devices and turned them over to Agent Baker. Agent Baker stated that Beckes had asked him whether he "was in trouble," to which Agent Baker replied "it depends on . . . how much we find once we complete the search." Following this interaction, the men

4

returned downstairs with the electronic devices that Beckes had turned over to Agent Baker. (While at the house, neither Blanco nor Beckes was ever asked to sign a consent form for the inspections made by the agents, so the court must make its determination based solely on the testimony elicited at the hearing.)

Once downstairs, Agent Baker testified that he asked Beckes "if he minded coming to the office to participate in an interview." Agent Baker stated that he gave Beckes the option to ride with them or to have Blanco drive him to the HSI office. Blanco, however, testified that Agent Baker's request for an interview with Beckes was framed more like a demand and less as an option, and that Agent Baker did not give Beckes the choice to have Blanco drive him to the HSI office. Blanco's testimony comports with Beckes', who testified that he "didn't want to go with" the agents to their office.

The agents and Beckes left the residence at noon, with Beckes riding in the front passenger seat of the agents' vehicle. On their way to the HSI office, the agents stopped at Jack-in-the-Box and purchased food for themselves and for Beckes. The agents and Beckes ate together at the agents' office, and Agent Baker testified that he explained to Beckes that he was not under arrest. For the first time, Agent Baker presented Beckes with a consent to search form. Agent Baker stated that he read and explained the form to Beckes, which gave the agents consent to search the devices recovered from Beckes' residence as well as those that had previously been searched. Beckes signed the consent to search form, which was admitted into evidence as the Government's Exhibit 1. Beckes' testimony regarding the consent to search form, however, differs significantly from Agent Baker's. Beckes did not recall specifically signing a consent to search form; rather, Beckes stated that "he was just signing" and that he didn't "know what was it, but I was just signing whatever."

After the consent to search form was signed by Beckes, Agent Baker began searching the other devices recovered from Beckes' residence. Agent Baker's search of one device yielded approximately 800 images of child pornography. Agent Baker returned to interview Beckes, and both parties testified that Agent Baker read Beckes his Miranda rights. Agent Baker testified that Beckes knowingly signed a form waiving his Miranda rights; Beckes, however, stated that he did not remember what he signed but "was just signing." During the interview that followed, Agent Baker stated that Beckes admitted to downloading images of child pornography. After Beckes' confession, Agent Baker placed him under arrest and took him to a holding cell at the HSI office.

About three hours after the agents had left his residence, Blanco drove to the HSI office, where he learned that Beckes had been placed under arrest. Blanco visited Beckes in his holding cell, where they were eventually joined by the agents who had visited their residence. When the agents walked in to the holding cell, Beckes exclaimed to Agent Baker "you were going to help me and you said you were not going to arrest me . . . !" In reply, Agent Baker told Beckes that he never said he was going to help, but regardless could not do anything now.

On the following day, August 6, 2014, a criminal complaint was filed in the Southern District of Texas, Brownsville Division, charging Beckes with one count of possessing child pornography in violation of 18 U.S.C. § 2252A. [Doc. No. 1]. Several days later, on August 15, 2014, Agent Baker made an application for a search warrant. [Doc. No. 15]. The warrant covered all electronics recovered from Beckes' residence, including those that had already been searched. When asked regarding the reason for this search warrant, Agent Baker testified that, because Beckes was under arrest, he would not voluntarily consent to a further search of his electronic devices. The warrant was returned executed on August 26, 2014.

Shortly after the complaint was filed, Beckes' attorney requested a psychiatric examination to evaluate Beckes' mental competency to stand trial. Although Beckes was found competent to stand trial, the report suggests that Beckes does not possess the mental capacity of a thirty-year old man. While attending public school in the Brownsville school district, Beckes was diagnosed with a learning disability and enrolled in special education classes. Despite graduating high school, Beckes does not possess a driver's license, relies on others for his transportation needs, and has considerable difficulty reading and writing. During his psychiatric evaluation, Beckes described a history of memory and concentration problems and stated that believed these problems arose because his mother took medicine while she was pregnant with him. Beckes' family history included both drug and alcohol abuse and, while growing up, he often witnessed violence between his mother and her significant other.

Blanco, who lived with Beckes for fourteen years, also testified that he did not believe Beckes possessed the mental capacity expected of a thirty-year old man. Blanco stated that, although Beckes was an adult, he was not in a position to support himself. Despite working at Pizza Hut for eight years, Beckes only worked twenty hours a week and completed tasks such as dish washing and busing tables. His duties at Pizza Hut remained menial during his lengthy period of employment. Blanco alone was responsible for all of the household expenses incurred by the two men, and "basically supported" Beckes.

III. <u>Discussion</u>

A. Consent to Search

The Fourth Amendment prohibits unreasonable searches and seizures, but permits a warrantless search if the suspect voluntarily consents. U.S. Const. amend. IV; *U.S. v. Cotton*, 722

F.3d 271, 275 (5th Cir. 2013). Consent to a warrantless search, however, must be freely and voluntarily given rather than the product of duress or coercion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). When a defendant challenges the voluntariness of a search, the Government bears the burden to prove by a preponderance of the evidence that consent was voluntary. *U.S. v. Arias-Robles*, 477 F.3d 245, 248 (5th Cir. 2007). However, "[t]he line between an accused's voluntary consent and his involuntary submission to police authority is often difficult to draw." *U.S. v. Jones*, 475 F.2d 723, 728 (5th Cir. 1973) (quoting *U.S. v. Como*, 340 F.2d 891, 894 (2nd Cir. 1965)). The voluntariness of consent cannot be lightly assumed—rather, the Government "must establish by clear and convincing evidence that consent was voluntarily given and was not coerced, either physically or psychologically." *Id.*

The voluntariness of consent is judged using a totality of the circumstances analysis. *Schneckloth*, 412 U.S. at 226. The Fifth Circuit has delineated the following six factors to aid courts with this determination: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *U.S. v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002). No single factor is dispositive of the analysis. *Id.*

In support of his motion, Beckes argues that he did not voluntarily consent to Agent Baker's initial search of his laptop computer, and that all evidence and statements that were obtained because of the images seized during that initial unlawful search should be suppressed. Specifically, Beckes emphasizes Agent Baker's alleged misrepresentations regarding the purpose of his home visit, arguing that Agent Baker deceived Beckes by telling him that the purpose of

the agents' search was to investigate "suspicious activity" occurring in the neighborhood rather than child pornography. Beckes also emphasizes the manner in which Agent Baker gained access to his electronic devices, arguing that he was ordered to produce the devices for a search, rather than requested. Further, taking into account Beckes' diminished mental capacity, the effects of Agent Baker's actions are compounded, thus showing that Beckes merely acquiesced to Agent Baker's claims of lawful authority rather than voluntarily, freely consenting to the search.

Conversely, the Government argues that Beckes knowingly and voluntarily consented to the initial search of his laptop computer. Setting forth a markedly different version of events, the Government argues that Agent Baker informed Beckes prior to the search of his laptop computer that the purpose of the agents' visit was to investigate images of persons under the age of eighteen. Agent Baker also testified that he specifically requested permission from Beckes to search his electronic devices, and did not order him to retrieve them or turn them over. According to the Government, these facts show that Beckes voluntarily consented to the search of his laptop computer, thus rendering all evidence and statements obtained afterwards admissible.

After carefully reviewing the facts of this case, the Court finds that Beckes did not voluntarily consent to Agent Baker's initial search of his laptop computer. Although this decision is very close, the Court was ultimately persuaded by its analysis of three of the six factors suggested for this determination: Beckes' education and intelligence, the presence of coercive police procedures, and Beckes' awareness of his right to refuse consent. Of these three factors, Beckes' education and intelligence weighed most heavily on the Court's decision—a logical inclination, since any inquiry concerning these matters necessarily pervades the analysis for the other five factors. Other courts have similarly made the defendant's education and intelligence

the focal point of their voluntariness analysis, recognizing that the subjective state of an individual must be analyzed to fully comprehend the significance of any outward behavior. *See, e.g., U.S. v. Barry*, 979 F. Supp. 2d 715, 720 (M.D. La. 2013) (defendant's limited grasp of English prevented a finding of voluntary consent, despite defendant's apparent cooperation with the officers).

Here, substantial evidence shows that Beckes does not possess the education or intelligence expected of a thirty-year old man. While attending school, Beckes was diagnosed with a learning disability and enrolled in special education classes. As an adult, he has considerable difficulty reading and writing as well as a history of memory and concentration problems—issues he believes stem from his mother's consumption of medicine while she was pregnant with him. Evidence also shows that Beckes is not self-sufficient and relies on others to fulfill his basic needs, such as transportation and shelter. Despite the fact that he has maintained a job for a number of years, Beckes has never worked more than twenty hours a week and his duties have remained menial. Based on these facts, the Court finds that Beckes does not possess the education and intelligence of a thirty-year old man—a deficiency that weighs heavily against a finding of voluntary consent.

Aside from its consideration as a discrete factor, Beckes' mental capacity also affects the Court's examination of the second factor in its voluntariness analysis: presence of coercive police procedures. Police misrepresentations accomplish the same purposes as coercion, and some courts have found that substantial misrepresentations regarding the purpose of a search can invalidate an otherwise voluntary consent. *See, e.g., U.S. v. Parson*, 599 F. Supp. 2d 592, 603 (W.D. Penn. 2009) (officers investigating child pornography told suspect that they were investigating "identity theft"; suspect's consent to search held invalid because of

misrepresentation). A statement, however, does not have to be an outright lie to be considered a misrepresentation—vagueness and ambiguity can still serve to misrepresent the true purpose of a search. Thus even for less substantial misrepresentations, a court should still "analyze the extent to which the deceit directly served to overcome a citizen's reticence or resistance to the search." *Id.*

Here, testimonies differed concerning what Beckes was told regarding the purpose of the agents' search. Agent Baker said he informed Beckes that he was "looking for images and videos of persons under the age of 18," while Beckes and Blanco testified that Agent Baker only said that he was investigating "suspicious activity" in the neighborhood. Although "suspicious activity" does not wholly misrepresent the purpose of Agent Baker's search, it does describe it ambiguously. The overall impression from the evidence is that Agent Baker either expressly or impliedly suggested that the search regarded conduct by the neighbors—not by Blanco or Beckes. Taking into account Beckes' limited mental capacity, this ambiguity would likely prevent him from understanding the true purpose or extent of the subsequent search, thus weighing against a finding of voluntary consent.

Even assuming that Agent Baker's account of his interaction with Beckes is accurate, the facts still show that more should have been done to ensure that Beckes' consent was voluntary and fully informed. Considering Beckes' mental capacity, the purpose of the search should have been more concretely described to ensure Beckes was making a fully informed consent—had Agent Baker said he was investigating "child pornography," Beckes would have undoubtedly understood what he was looking for and what the search would entail. Although "images and videos of persons under the age of 18" would convey the same meaning to a person of average intelligence, Beckes is not functioning on that level. Thus, taking into account his specific

characteristics, more should have been done to ensure that Beckes' consent was indeed voluntary and fully informed as required to waive his Fourth Amendment rights.

Other testimony—also hotly contested—suggests that the agents may have employed other coercive procedures to gain Beckes' consent. These facts, however, also implicate the third factor of the Court's analysis: Beckes' awareness of his right to refuse consent. According to Agent Baker, after explaining the purpose of his investigation to Beckes, he requested that Beckes retrieve his electronic devices and specifically asked for permission prior to initiating the search. Beckes' and Blanco's testimonies, however, suggest that Agent Baker's "requests" were more akin to orders: Agent Baker allegedly *told* Beckes to retrieve his electronic devices, and grabbed his computer and began searching without asking for permission. Taking into account Beckes' mental status, these actions would be particularly effective and coercive: Beckes' mental condition would make him particularly vulnerable to commands without considering whether or not his compliance was mandatory. Similarly, such commands may have suggested to Beckes that he did *not* have the right to refuse consent. As discussed in the facts, Beckes did not allow the agents to enter his residence—rather, Beckes came downstairs only after the agents had been admitted into the home. Confronted with agents that he did not admit and subsequently ordered to turn over his electronic devices, Beckes may not have been aware that refusing to cooperate was even an option.

Although the prior facts are contested, Agent Baker testified that he did not specifically inform Beckes that he had the right to refuse consent to the search of his laptop computer. The failure to inform a suspect that he has the right to refuse consent to a search does not automatically invalidate any later-given consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The facts of this case demonstrate, however, that informing Beckes of this right would

have been particularly prudent to ensure that any later consent was voluntarily given. As mentioned, Beckes did not allow the officers into the residence and he may have assumed that they had relied upon a search warrant to enter the home, thus negating the need to ask for permission to search. Further, Beckes' limited mental capacity provides another reason for the agents to have ensured that he understood the situation and his rights therein, and that his later consent to search was valid. Therefore, although much of these facts are contested, the court finds that the second and third factors of its voluntariness analysis—the presence of coercive police procedures and Beckes' awareness of his right to refuse consent—weigh against a finding of voluntary consent.

The factors remaining in the voluntariness analysis—Beckes' belief regarding whether incriminating evidence would be found, the voluntariness of his custodial status, and his extent of cooperation with the police—do not conclusively favor either Beckes' position or the Government's. Under the Court's totality of the circumstances analysis, however, the evidence is not sufficient to show that Beckes' consent to a search of his laptop computer was voluntary. Beckes' limited mental capacity, his likely unawareness of his right to refuse consent, and the agents' use of coercive procedures show that Beckes' consent to search his laptop computer was not freely and voluntarily given. Accordingly, the Court finds that Beckes did not voluntarily consent to Agent Baker's search of his laptop computer and therefore all incriminating evidence found during that search must be suppressed.

The Court emphasizes, again, that its decision on this issue is one upon which reasonable minds could differ, but it is one upon which the government bears the burden the proof. *See U.S. v. Arias-Robles*, 477 F.3d 245, 248 (5th Cir. 2007). One point, however, needs to be addressed. Although it did not impact its analysis, the Court is puzzled at the HSI agents failure to utilize

the procedures available to legitimize or at least document this type of investigation and thus avoid the ensuing dispute regarding the validity of the search altogether. At least one year before Agent Baker visited Beckes' residence, he had evidence that child pornography was being downloaded to an IP address associated with that location—evidence he deemed sufficient to apply for and actually receive a warrant to search Beckes' home. Although this IP address was canceled before Agent Baker could execute the search warrant, in January of 2014—at least eight months before his visit to Beckes' residence—Agent Baker discovered that child pornography was *again* being downloaded to an IP address associated with the same residence. Despite this evidence, which obviously would have been sufficient to obtain a second search warrant, as it is the same kind of evidence used to obtain the first warrant, the agents instead chose to proceed without a warrant and rely on attempts to secure the suspects' voluntary consent to search their electronic devices. Then, having decided on this course of action, they did not even attempt to get a signed consent to search form to document this assent. These forms were obviously available in their own office. Although foregoing the necessary procedural safeguards may have seemed expedient at the time, there was no suggestion that time was of the essence or that any other reason existed for not getting a warrant, or at least proof that consent was given.

Further, the steps the agents took after securing the pornographic images from Beckes' laptop computer suggest that they too doubted the legitimacy of Beckes' consent to search. After arriving with Beckes at the HSI office, Agent Baker had him sign a consent to search form that included devices that had already been searched at Beckes' residence. Then, nine days after the complaint against Beckes was filed in federal court, Agent Baker applied for and received a warrant to search Beckes' electronic devices—a warrant that included devices Baker had already

searched twice. Had he considered Beckes' initial consent to search inarguably valid, Agent Baker likely would have deemed these subsequent actions unnecessarily redundant.

B. Suppression of the Evidence

According to the "fruit of the poisonous tree" doctrine, all evidence obtained as the result of an illegal search or seizure conducted in violation of the Fourth Amendment must be suppressed. *U.S. v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998). This evidence need not be suppressed, though, if the Government can show "that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." *Id.* This inquiry essentially asks whether the challenged evidence "was obtained by exploitation of that illegality or instead by a means sufficiently distinguishable to be purged of the primary taint." *U.S. v. Wilson*, 36 F.3d 1298, 1306 (5th Cir. 1994).

Here, the Government seeks to admit two confessions Beckes made following Agent Baker's unlawful search of his laptop computer: His confession at his residence (that he "had other devices that would have the same type of material on it") and his oral confession at the HSI office. The admissibility of confessions obtained after a Fourth Amendment violation is analyzed using an attenuation of taint analysis. *U.S. v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013).

In addition, the Government seeks to rely upon two additional instances where Beckes allegedly gave consent to search his electronic devices: When, at his residence, he handed over additional electronic devices to Agent Baker after the initial search of his laptop computer and the signed consent to search form he executed at the HSI office. Because these consents to search were immediately preceded by a Fourth Amendment violation, the Court undertakes a two-pronged analysis to evaluate their validity: (1) whether the consent was given voluntarily; and (2)

whether the taint from the previous unlawful search was dissipated. *U.S. v. Richard*, 994 F.2d 244, 250 (5th Cir. 1993). This Court finds that Beckes' later consents could not dissipate the taint from the initial unlawful search of his laptop computer. That being the case, it need not proceed to conduct a voluntariness analysis, as well. The Court's "attenuation of taint" analysis will begin first with the confession and consent obtained at Beckes' residence, and then examine the confession and consent obtained at the HSI office.

When making an attenuation of taint analysis, the Court considers three factors: (1) the temporal proximity of the unlawful search and the later consent or confession; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-604 (1975). Turning to the first factor, when there is close temporal proximity between the unlawful search and the subsequent consent or confession, the taint from the Fourth Amendment violation is unlikely to have dissipated. *See Cotton*, 722 F.3d at 278 (defendant's inculpatory remarks came "on the heels" of the unlawful search, and were subject to suppression); *U.S. v. Jaquez*, 421 F.3d 338, 342 (5th Cir. 2005) (consent obtained shortly after an unlawful stop ineffective). Here, the consent and confession obtained at Beckes' residence came only minutes after the initial search of his laptop computer, suggesting that the taint from that unlawful search had not dissipated.

Further, no material intervening circumstances were present between the time of the agents' initial search and Beckes' subsequent consent and confession. In fact, there were practically no intervening circumstances—immediately after discovering the pornographic images, Agent Baker requested that Beckes follow him upstairs, where Beckes subsequently confessed and consented to a search of his additional electronic devices. For the final factor, the prior discussion has already expounded upon the HSI agents' conduct in this investigation. It is

sufficient to reiterate that the agents could have easily utilized the proper investigatory tools available to them to ensure that they indeed received voluntary consent from Beckes to search his electronic devices. The Court therefore concludes that the taint of the Fourth Amendment violation did not dissipate at the time of Beckes' consent and confession obtained at his residence.

Turning to the second consent and confession obtained at the HSI office, the Court's conclusion is the same. Although the temporal distance here is greater than that for the first consent and confession, a space of several hours does not guarantee that the taint of the unlawful search has dissipated. *See, e.g., U.S. v. Conklin*, 63 M.J. 333, 339 (C.A.A.F. 2006) (three hours not sufficient to dissipate taint from unlawful search); *U.S. v. Barth*, 26 F. Supp. 2d 929, 940-41 (W.D. Tex. 1998) (passage of two days between unlawful search and later consent and confession not sufficient to dissipate taint). The second factor of this analysis, however, clearly shows that the taint had not dissipated at the time of Beckes' second consent and confession. Rather, the evidence shows that all activities undertaken during this period resulted from and concerned the discovery of the pornographic images on Beckes' laptop computer. Further, this consent and confession would not have been obtained but for the evidence seized in the initial unlawful search. *See U.S. v. Hernandez*, 279 F.3d 302, 309 (5th Cir. 2002) (in regards to whether any intervening circumstances were present, court asked whether the challenged evidence was "obtained by exploitation of the illegality"). Taking these factors into account, the Court concludes that Beckes' consent and confession obtained at the HSI should be similarly suppressed.

IV. <u>Conclusion</u>

The images found on Beckes' laptop computer during the search Agent Baker conducted at Beckes' residence are suppressed as the product of an unlawful search and seizure in violation of the Fourth Amendment. Subsequent evidence discovered on Beckes' electronic devices, as well as any statements, admissions, or confessions made by Beckes, are suppressed as evidence derived from the exploitation of an unlawful search and seizure. The Motion to Suppress is therefore **GRANTED**.

SIGNED this 15th day of December, 2014.

Andrew S. Hanen
United States District Judge